

FILED & JUDGMENT ENTERED

Christine F. Winchester

September 29 2025

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

_____
Ashley Austin Edwards
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

In re:　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　Case No.: 24-31129
　　RYAN LASHON FORD,　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　Chapter 7
　　　　　　　　　Debtor.　　　　　　)
　　　　　　　　　　　　　　　　　　)

## ORDER AND OPINION DENYING MOTION FOR RECUSAL

THIS MATTER is before the Court upon the *Amendment* [sic] *Motion for Recusal of Trustee and Bankruptcy Administrator* [Do. No. 207] (the "Motion"), which was filed by Ryan Lashon Ford (the "Debtor") originally on July 10, 2025,[1] against the Chapter 7 trustee in the Debtor's case, Melanie D. Johnson Raubach (the "Trustee"), and Heather Culp as the Bankruptcy Administrator for the Western District of North Carolina (the "Bankruptcy Administrator").[2] The

---

[1] The Debtor's amended motion, which is the version considered as to the merits by the Court with regard to this Order, was filed August 29, 2025. Its predecessor (the "Original Motion") is docketed at No. 131.
[2] Debtor's Original Motion, the Motion, and her *Reply to Objection of the Trustee* [Do. No. 208] (the "Debtor's Reply"), all three identify as the Bankruptcy Administrator and seek the recusal of Heather Culp, who is not the Bankruptcy Administrator, but the staff attorney for the Bankruptcy Administrator,

1

Court conducted a hearing on the Motion on September 8, 2025 (the "Hearing"). At the Hearing, all parties appeared on behalf of themselves. Following the Hearing, the Court took this matter under advisement and now renders its opinion.

**FACTS AND PROCEDURAL HISTORY**

**I. Introduction**

On December 23, 2024 (the "Petition Date"), the Debtor filed for bankruptcy under Chapter 7. *Voluntary Petition* [Do. No 1] (the "Petition"). Generally, Chapter 7 cases are straightforward and offer distressed debtors an opportunity to discharge debt in an organized, transparent, and efficient legal process. This *pro se* case is atypical with over two hundred filings in the last ten months. The Debtor has filed no fewer than a dozen motions: a motion to dismiss the bankruptcy proceeding, a motion to appear remotely, a motion to bring a laptop to court, two motions to convert the case to one under Chapter 11 of the Bankruptcy Code, two motions to declare that certain property is tribal property and not property of the bankruptcy estate, a motion to convert the case to one under Chapter 13 of the Bankruptcy Code, a motion to refer certain matters to mediation, a motion to compel the Trustee to provide a settlement amount to the Debtor, a motion for a protective order to limit discovery, and a motion to recuse the Trustee and Bankruptcy Administrator. Most of these motions have required responses from the Trustee and the Bankruptcy Administrator as well as replies to the Debtor's replies. The Court denied virtually all of these motions.

---

Shelley K. Abel. Relatedly, some references to specific comments or exchanges made by the Bankruptcy Administrator in this opinion came specifically from Ms. Culp.

**II. Debtor's Assets and the May Hearing**

Before filing and within two years of the Petition Date, the Debtor transferred two properties (the "Properties") to a limited liability company wholly owned by the Debtor. While the Debtor disclosed an interest in the Properties in the Petition, she significantly understated their value by an estimated 90% and did not disclose the transfers (or any others) in response to question 18 of the statement of financial affairs, which asks whether the Debtor sold, traded, or otherwise transferred any property to anyone within the two years before the Petition Date. Despite this omission, the Trustee learned of these transfers and filed an adversary proceeding to recover the properties as fraudulent transfers.

With the Petition, the Debtor filed an application to proceed *in forma pauperis*, declaring that she had no cash or money in her accounts, which the Court granted. The Court later learned from the Trustee that the Debtor had at least $7,000 as of the Petition Date.

Since the beginning of this case, the Debtor has made numerous arguments that use legalistic language and terms but do not accurately represent current law. The Debtor has been a member of the Xi Amaru Tribal Government (also known as ARNA) (the "Tribe") since, according to the Debtor, "maybe 2022." The Debtor was associated with the Tribe at the time she transferred the Properties.[3] On January 8, 2025, at a meeting of creditors, the Debtor asserted that, following the transfer of the Properties, they belonged to the Tribe.[4]

At a hearing held on May 27, 2025 (the "May Hearing"), the Debtor testified to having begun courses with the Tribe prior to the Petition Date (the "Courses"), one of which was on

---

[3] *See* Ex Parte *Motion for Production of Documents Only from Aboriginal Republic Of North America, Xi-Amaru Tribal Government, Aboriginal University, And Amaru Xi-Ali D/B/A Xi Amaru Tribal Enterprises Pursuant to Bankruptcy Rule 2004* ¶ 7 [Do. No. 148] (the "Second *Ex Parte* Motion").
[4] *See* Ex Parte *Motion for Production of Documents Only from Certain Banks, Credit Unions, And Financial Technology Companies Pursuant to Bankruptcy Rule 2004* [Do. No. 144].

3

'jurisprudence'. The Bankruptcy Administrator, through independent research, learned that the 'School of Law' associated with the Tribe offers courses focusing on topics that include "Tribal Business Registration," "Business & Personal Credit," "Law Consultation," "Lawsuit Drafting," "Business Credit and Personal Credit Services," "Patent Trademark Copyright Training," and "Land Trust Services," and that homework for a course tested participants on their knowledge of bankruptcy and insolvency, such as the difference between Chapter 11 and Chapter 13.[5] The Bankruptcy Administrator cross-examined the Debtor on the Courses at the May hearing, but the Debtor could not recall answers to most of the questions related to the Courses or the Tribe, such as exact costs of the Courses, their precise completion dates, or how she paid.[6] Based upon (1) the

---

[5] *Second* Ex Parte *Motion* ¶ 12.

[6] At the May Hearing, the Debtor could also not recall exact details regarding (1) the monthly mortgage payment for at least one of the Properties, (2) the tenants' names, the name of the company her property manager works for, (3) how long her property manager has managed the property or when she first met her, (4) the bank holding accounts associated with the Debtor's LLC or the Properties, (5) whether she has ever visited a physical branch, (6) when she opened that account, (7) its current balance, (8) whether any deposits other than rent had been made post-petition, (9) whether the May rent on the Properties had been paid, (10) who receives statements for that account, (11) the amount of cash she received in a 2021 refinance of one of the properties or the precise date of that refinance, (12) who prepared her 2023 tax return, (13) when she purchased a vehicle she owned or whether that purchase pre- or post-dated her becoming active in the Tribe, (14) being asked at the creditors meeting about transferring property to the Tribe, (15) all repairs made at a property in the last year beyond a washer and dryer, or (16) whether there were any other Tribal holdings or assets under her control beyond the real properties and account discussed.

This would begin a trend of the Debtor being unable to recall important details the Trustee or Bankruptcy Administrator sought to move the Debtor's case along. At the First July Hearing, the Debtor could not recall (1) when a bank account closed or the reason for its closure, (2) the last time she deposited into a different emergency fund account, (3) if she had listed any closed bank accounts on her bankruptcy papers, (4) any details about a transfer on her bank statement, (5) the ownership or details of multiple other bank accounts, or (6) whether she still had access to two bank accounts—all despite having accessed some of her bank statements online for the very accounts queried about. At the Second July Hearing, the Debtor could not recall (1) details regarding a Zelle transfer to an undisclosed account, (2) details regarding Coinbase account activity, (3) whether she had provided statements for another account starting from June, or (4) whether she had provided or even remembered any related documents for another transfer, among others. At the September hearing, the Debtor could not recall (1) the exact dates or periods when certain accounts were used or closed or whether they were closed this year or last year, (2) any details related to other accounts for the period between February 2023 and May 2023 or for 2025, (3) whether she had previously disclosed certain accounts, including a savings account, (4) the exact nature or timeframe of her use of another account related to transfers, (5) the details for a transfer on

4

lack of answers from the Debtor and the need of complete facts and (2) a concern that the unauthorized practice of law had or occurred was occurring, the Trustee and the Bankruptcy Administrator sought from the Debtor documents related to the Courses (the "Discovery Request"). At this hearing, the Debtor also revealed accounts which she had failed to disclose in her Petition which the Court ordered the Debtor to produce.

### III. June Hearings and the Reference

At a hearing held on June 23, 2025 (the "June Hearing"), the Debtor acknowledged that she had not produced any of the documents since the May Hearing. As well, the Debtor initially stated that she did not recall sending multiple emails to the Trustee in the following week, which the Trustee then read into the record at the June Hearing. The Debtor subsequently acknowledged that she had emailed and informed the Trustee that she would produce documentation at some point. The Debtor also requested that a mediator be appointed and that a settlement amount be provided to allow the Debtor to pay off all creditors in a lump sum. The Trustee and the Bankruptcy Administrator informed the Debtor that that was not possible because they could not be fully aware of who may be a rightful creditor until they received the bank records and other pertinent information that the Debtor had failed to produce. Following the June Hearing, the Court entered the *Order from Omnibus Hearing on June 23, 2025* [Do. No. 111] (the "Omnibus Order"), which formally ordered the Debtor to provide documents related to various bank accounts the Debtor had not disclosed as well as documents related to the Courses.

On June 27, 2025, the Debtor filed in the District Court to have the reference of this case to this Court withdrawn.[7] In that filing, the Debtor alleged various facts such as receiving

---

February 14th, 2024 (6) the details regarding possibly lost documents from another account, or (7) the details regarding a co-op system for another account, among others.
[7] *Notice of Motion to Withdraw a Reference of Bankruptcy Petition* [Do. No. 121].

5

voicemails from the Trustee that did not occur. As well, many paragraphs utilized masculine pronouns interspersed with feminine pronouns (which the Debtor uses in general), suggesting that the pleading had been duplicated from one with a male-identifying individual. At the Second July Hearing, when the Bankruptcy Administrator inquired about the voicemails, the Debtor stated she "did not remember writing this."

**IV. July Hearings and the Debtor's Original Motion**

Prior to a hearing held on July 7, 2025 (the "First July Hearing") and to provide an update regarding the production of documents, the Trustee and the Bankruptcy Administrator filed their *First Status Report* [Do. No. 125], which asserted that the Debtor had failed to provide any of the requested documents to the Bankruptcy Administrator and failed to provide many of the requested documents to the Trustee. The Trustee and the Bankruptcy Administrator also recommended that the Court find the Debtor in contempt and fine her $100 a day until she complied with the Omnibus Order. Following the First July Hearing, the Court entered the *Order Finding Debtor in Civil Contempt* [Do. No. 132] (the "Contempt Order") and found the Debtor in civil contempt. However, the Court gave the Debtor one more chance to fully comply with the Omnibus Order before imposing sanctions and ordered that a hearing occur on July 21, 2025 (the "Second July Hearing"), to assess compliance with the Contempt Order.

Immediately following the First July Hearing but before the Contempt Order was entered on July 14, 2025, the Debtor filed this Motion. The Original Motion made multiple statements of fact that were irrefutably false. *See Original Motion* ¶ 4 (declaring that the information sought by the Discovery Request "was revealed or used by the Trustee" and that "[b]y divulging estate information she had no authority to release, the Trustee breached her duty to safeguard estate assets and respect applicable privacy and property rights," and that the Bankruptcy Administrator "was aware of, or failing [sic] to prevent, this disclosure"). Upon receiving a letter from the Bankruptcy

6

Administrator regarding this falsity, the Debtor filed her amended motion and removed such statements.

At the Second July Hearing, the Debtor asserted that she had complied with certain portions of the Court Orders. When asked by the Court to provide any argument regarding the mitigation of sanctions, the Debtor acknowledged "mistakes" but stated that she could not provide the Courses' documents as doing so would violate federal law. When asked what law she would violate, the Debtor cited 11 U.S.C. § 541, 15 U.S.C. § 114, 17 U.S.C. §§ 504 and 505, 18 U.S.C. § 241, and the Indian Arts and Crafts Act. There is no section 114 in Title 15 of the United States Code, and the other cited statutes are inapplicable. Following the Second July Hearing, the Court imposed the recommended daily sanctions.

## V. September Hearing

Between the Second July Hearing and the next hearing, the Debtor partially complied with the Contempt Order as pertaining to certain, but not all, accounts, but did not comply with the Discovery Request. At a hearing on September 8, 2025 (the "September Hearing"), the existence of further accounts was revealed, placing the total number in the dozens. At the same hearing, the Debtor explicitly refused to produce documentation related to the Courses. The Debtor also refused to answer the Court's questions about the Courses and who may be threatening her with legal action, which she asserted is why she cannot turn over the Courses' documentation in compliance with the Court Orders. Given the Debtor's refusal to comply with the prior order, following the September Hearing, the Court raised the Debtor's daily contempt fines to $150.

Further, the parties presented their arguments as to the Motion. When the Debtor was asked about the false statements made in her Original Motion, the Debtor stated she "made an error when

7

[she] was on typing" and "misspoke."[8] At the hearing, the Court also became aware of the fact that in 2023, the Debtor was sanctioned in state court and ordered to pay $8,000 pursuant to Rule 11 for filing a "verified pleading which contained facts and statements of law that were insufficient to satisfy the grievances [ ] alleged" and "were not credible,"[9] which she did not appeal.

## DISCUSSION

### I. Legal Background

#### A. Legal Standard for Recusal

"The court [ ] may remove a trustee [ ] for cause." 11 U.S.C. § 324(a). Removal of a trustee is "as serious an action as a bankruptcy judge could possibly decide" that should "not [be] undertaken lightly," *In re Walker*, 2004 Bankr. LEXIS 2187, 2004 WL 3152787 (Bankr. S.D. Fla. Dec. 1, 2004), *aff'd*, *Walden v. Walker*, 515 F.3d 1204 (11th Cir. 2008), partly since "if a trustee is removed, he or she is also removed from all other bankruptcy cases in which he or she is involved unless the court rules otherwise." *In re Tres-Ark, Inc.*, 483 B.R. 460, 467 (Bankr. W.D. Tex. 2012) (citing 11 U.S.C. § 324(b)).

For recusal, "[t]he standard of review is clear and convincing evidence." *In re JMW Auto Sales*, 494 B.R. 877, 890 (Bankr. S.D. Tex. 2013). "The 'party seeking removal' bears the burden of proof and meets this burden by providing evidence of 'specific facts' warranting removal." *Dye v. Brown (In the Matter of AFI Holding, Inc.)*, 530 F.3d 832, 845 (9th Cir. 2008) (quoting 3 Collier on Bankruptcy ¶ 324.02, at 324-3 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2006)). "As the movant, the Debtor bears the burden of establishing cause by setting forth specific facts which support the removal of the Trustee. A conclusory contention unsupported by specific facts

---

[8] *Court Recordings of September 8, 2025 Hearing* [Do. No.s 214-217] (the "September Hearing Recordings") (The Debtor's statements at 44-17-44:20 and 44:45-44:50).
[9] *Exhibit List for September 8, 2025, Hearing, Bankruptcy Administrator Ex. 3, State Court Order re: Def/Father's Motion for Rule 11 Sanctions* [Do. No 218].

8

does not constitute sufficient grounds for the removal of a trustee." *In re Alexander*, 289 B.R. 711, 714 (B.A.P. 8th Cir. 1999). "[H]orrible imaginings alone cannot be allowed to carry the day." *In re Martin*, 817 F.2d 175, 181–83 (1st Cir. 1987).

The Bankruptcy Code does not define 'cause'. However, courts have held that "cause may include trustee incompetence, violation of the trustee's fiduciary duties, misconduct or failure to perform the trustee's duties, or lack of disinterestedness or holding an interest adverse to the estate." *Schoenmann v. United States Tr. (In re Li's Cap. LLC)*, 2025 Bankr. LEXIS 902 *10-*11 (citing *Dye v. Brown (In re AFI Holding, Inc.)*, 530 F.3d 832, 845 (9th Cir. 2008)). "[C]ause to remove a trustee cannot be found in actions that fall within the proper scope of the trustee's discretion." *In re Consol. Indus. Corp.*, 330 B.R. 712, 715 (Bankr. N.D. Ind. 2005). "Cause to remove a trustee must be something of a substantial nature directly affecting the rights and interests of the public. . . . Moreover, when making a removal decision, a court must consider the best interest of the estate, not merely that of a single complaining movant." *United Tax Grp., LLC*, 622 B.R. at 157 (citing *In re Baker*, 38 B.R. 705, 707 (D. Md. 1983)).

Lastly, a debtor "may not necessarily have standing" to have a trustee removed. *In re Bashour*, 124 B.R. 52, 54 (Bankr. N.D. Ohio 1991). "Generally, removals are sought by creditors who do not believe that the trustee is qualified or acting to protect creditors' interests." *Id.* (citing *In re El San Juan Hotel Corporation*, 841 F.2d 6, 8-9 (1st Cir. 1988); *In re Persky*, 893 F.2d 15, 17-18 (2d Cir. 1989)).

### B. Legal Duties for the Trustee and Bankruptcy Administrator

The Bankruptcy Code imposes a litany of obligations on a trustee. These include the duty to "collect and reduce to money the property of the estate [ ] and close such estate as expeditiously as is compatible with the best interests of parties in interest," "be accountable for all property

9

received," "ensure that the debtor shall perform his intention as specified in [§ 521(a)(2)(B)]," "investigate the financial affairs of the debtor," "examine proofs of claims and object to the allowance of any claim that is improper," "if advisable, oppose the discharge of the debtor," "furnish such information concerning the estate and the estate's administration as is requested by a party in interest," "make a final report and file a final account of the administration of the estate." 11 U.S.C. § 704(a)(1)-(9). Although there are limited situations where a trustee owes a debtor a duty,[10] generally, "[a] trustee's fiduciary duties are owed to the estate and creditors, not the debtor personally." *In re Livore*, *supra*, 2010 Bankr. LEXIS 1653 *16-17 (citations omitted); *see also In re Perez*, 30 F.3d 1209, 1214 (9th Cir. 1994) ("Counsel for the estate must keep firmly in mind that his client is the estate and not the debtor individually."); *cf. Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) ("One of the painful facts of bankruptcy is that the interests of shareholders become subordinated to the interests of creditors.").

Although the Bankruptcy Administrator's duties are not delineated within the Bankruptcy Code as such, they are generally coterminous with those imposed on its equivalent outside of North Carolina and Alabama, the U.S. Trustee.[11] Thus, they are obliged to "supervise the administration

---

[10] *Wisdom v. Gugino*, 649 Fed. App'x 583, 584 (9th Cir. 2016) (citing U.S. Dep't of Justice, Executive Office for the United States Trustees, *Handbook for Chapter 7 Trustees* 4-2 (2012)) ("When a debtor retains an interest in estate assets—either by properly claiming exemptions or because surplus property will remain in the estate after all creditors have been compensated—the trustee owes a fiduciary duty to the debtor as well.").

[11] *See* CTA11 Add. IX (the Eleventh Circuit's Statement that Alabamian bankruptcy administrators' "duties are essentially the same as those of the U.S. trustees in the Department of Justice"); U.S. Gen. Accounting Off., *Bankruptcy Administration: Justification Lacking for Continuing Two Parallel Programs: Report to the Chairman, Permanent Subcomm. on Investigations, Comm. on Governmental Affairs, U.S. Senate*, App. III, tbl. III.1-2, at 35-36 (Sept. 1992) (outlining how bankruptcy administrators do virtually all the activities of US Trustees, including, in Chapter 7 cases, "[r]eview[ing] petitions for abuse, trustee operations, case status reports, fee applications, closing reports, trustee bonding" and "[r]eceiv[ing] bank statements/reports," in Chapter 11 cases, "[r]equir[ing] monthly financial reports, visit debtor premises, encourage creditor committees, review disclosure statements," in Chapter 13 cases, "[r]equir[ing] annual budget, annual report, trustee bonding, independent CPA audit," and, in all,

of cases. . . by reviewing. . . applications filed for compensation and reimbursement under [§ 330], filing with the court comments with respect to such application and, if. . . appropriate, objections to such application," 28 U.S.C. § 586, as well as to "review all materials filed by the debtor and. . . file with the court a statement as to whether the debtor's case would be presumed to be an abuse under [§ 707(b)]." 11 U.S.C. § 704(b)(1)(A). Bankruptcy Administrators also serve a more generalist role focused on the public's stake in the proper administration of the bankruptcy system. *See, e.g.,* E1 Collier on Bankruptcy B (16th 2025) ("The bankruptcy administrators were given standing to raise, appear, and be heard on any issues under the Bankruptcy Code, and were allowed to present to the court, on the record and with notice to the parties, any views or recommendations regarding matters within the scope of their duties. Furthermore, the bankruptcy administrators were empowered to initiate a review and investigation of any allegations of fraud and misconduct, and to make appropriate referrals thereof."); *see also Lynch v. Jackson*, No. 16-1358 at 120 n. 1 (4th Cir. 2017) ("The [bankruptcy administrator] acts to prevent fraud and abuse in bankruptcy proceedings."); *and* H.R. REP. 95-595, 88, 1978 U.S.C.C.A.N. 5963, 6049-50 ("[Bankruptcy administrators] will serve as bankruptcy watch-dogs to prevent fraud, dishonesty, and overreaching in the bankruptcy arena," given "there is a public interest in the proper administration of bankruptcy cases" since "[b]ankruptcy is an area where there exists a significant potential for fraud, for self-dealing, and for diversion of funds.").

---

"computerized case tracking system, download data from clerk's office, require interest-bearing accounts.").

## II. Analysis

### A. The Debtor's Allegations of Misconduct

The Debtor's most prominent allegation is that the Discovery Request constitutes misconduct because it is illegal[12] or extralegal.[13] At bottom, the Discovery Request does not and cannot constitute either. First and as the Court has continuously explained to the Debtor over the last four months, there is nothing illegal about it. That the Discovery Request is not copyright infringement is true, not only actually, but also constitutively so. *See, e.g.*, *Bond v. Blum*, 317 F.3d 385, 397 (4th Cir. 2003) (holding that disclosure of copyrighted materials in litigation is Fair Use and non-infringing since the purpose is adjudication, not commercial exploitation); *see Courtroom Recording on Sep. 8, 2025 at 1:39:07 PM* [Dkt. No. 216] (statement of the Court at 5:44–6:05) ("[C]opyright law itself contemplates compelled production and evidentiary use; it is not a privilege that defeats discovery. Otherwise, copyright would be unenforceable. How else could courts come to any decisions on the matter? The same protections that Debtor claims her noncompliance upholds would not exist if litigants adopted her view."). Relatedly, the Debtor alleges various violations of Rule 2004's principle against fishing expeditions based on the Discovery Request. However, a challenge to a Rule 2004 motion is not appropriate grounds for a recusal motion. Rather, a party must object to the Rule 2004 motion specifically. No such objection was filed in this case.

Second, it clearly is not extralegal. The Discovery Request is not only generally authorized as a standard litigation tool available to all parties, including the Debtor, but it has also been specifically authorized in this case by the Court, not only initially when it was first made, but also currently under the Contempt Order. The Debtor's continued assertion otherwise contravenes the

---

[12] *See, e.g.*, *The Motion* ¶¶ 5, 7, 33-34, 37, 41-44, 47, 49, 50.
[13] *See, e.g.*, *The Motion* ¶¶ 4, 7, 9, 34-35, 45, 47, 50-51.

Court's rulings and the Contempt Order. Thirdly and most importantly, far from being illegal or extralegal, the Discovery Request is statutorily required of the Trustee and Bankruptcy Administrator, as the Court will discuss next.

### B. The Debtor's Allegations of Partiality, Conflicts of Interest, and General Bias

The Debtor also alleges that the actions of the Trustee and the Bankruptcy Administrator display that they have interests contrary to their duties either because they are adverse to the Debtor internally in this case or because they are motivated by improper external sources.[14] For example, the Debtor alleged at the September Hearing that both the Trustee and the Bankruptcy Administrator were motivated by "money and prestige"[15] and that their actions were "not for the benefit of the creditors" since she was "trying to go ahead and pay my creditors," which the Discovery Request precluded.[16] The Debtor also discloses that she has filed a complaint against the Trustee with the North Carolina Bar (the "Bar Complaint"), which creates a conflict between her and the Trustee.[17]

Setting aside the Bar Complaint for the moment, any adverseness between the Trustee and the Bankruptcy Administrator and the Debtor here is not improper; it is legally imposed. The Trustee's and the Bankruptcy Administrator's statutory duties require them to oppose the Debtor when doing so serves the best interests of the estate, creditors, or the integrity of the bankruptcy system. The Debtor's interests do not supersede those of other interested parties. Neither the Trustee nor the Bankruptcy Administrator is the Debtor's counsel; their role can, and often must,

---

[14] *See, e.g., The Motion* ¶¶ 33, 35, 37, 39, 44-46.
[15] *Court Hearing Recording September 8, 2025* (Debtor's statement at 11:46-11:56).
[16] *Court Hearing Recording September 8, 2025* (Debtor's statement at 4:28-5:52).
[17] *See The Motion*, ¶ 69.

13

be opposing within an adversarial framework.[18] Thus, as to Debtor's assertion that there is "no explanation" for the Discovery Request besides "prestige," Trustee and the Bankruptcy Administrator do not obtain 'prestige' but merely maintain employment by fulfilling their statutory duties.

As to the Debtor's statement that the Trustee's and the Bankruptcy Administrator's actions preclude her "pay[ing] her creditors," that argument is a red herring. The record reflects that the Trustee and the Bankruptcy Administrator have consistently acted to protect creditor recoveries by opposing certain Debtor motions due to inadequate notice or to preserve collateral necessary to fund those recoveries. And even if the Discovery Request does not directly increase distributions, it advances the orderly administration of the bankruptcy system, which the Trustee and the Bankruptcy Administrator are duty-bound to promote and which ultimately benefits all parties, including the Debtor.

1. The Debtor's State Bar Complaint

Regarding the Bar Complaint, the Debtor is right that, at least factually, it does place her in formal opposition to the Trustee. However, first, to reiterate, it is unclear whether conflicts between a trustee and only the debtor, not the estate, can form a basis for recusal. Second, and more importantly, the Bar Complaint is itself unlawful as against a trustee in the current procedural posture.

Our Court considered this issue squarely in *In re Seertech Corporation*. Case No. 06-31156 [Do. No. 90] (W.D.N.C. Bankr. September 12, 2007). There, a party similarly filed a state bar complaint against the trustee. As this Court explained there, such action violated the "automatic

---

[18] Debtor's assertion otherwise is all the more illogical given that the Debtor, as a landlord, is herself a potential creditor who, if ever needing to recover from a debtor-tenant, would be dependent on a trustee acting for her interests to receive fair treatment in bankruptcy, even if adverse to that debtor.

14

stay. . . . [W]hich bars outside efforts to control either the estate or its property," as well as "the Barton Doctrine, [whereby] a bankruptcy trustee may not be sued in another tribunal without leave of the appointing court." *Seertech* at 15-16 (first citing 11 U.S.C. § 362(a) then citing *Gordon v. Nick*, 162 F.3d 1155 (4th Cir. Sept. 2, 1998), *Schafler v. Field*, 2001 WL 34553964 (D. Md. Aug. 15, 2001), and *In re Byrd,* 2007 WL 1485441 (Bankr. D. Md. May 18, 2007) (all citing *Barton v. Barbour*, 104 U.S. 126, 26 L. Ed. 672 (1881))). The Bar Complaint here is no different.

Similarly, even if a conflict between a trustee and exclusively the debtor could constitute conflict warranting recusal, the Court of course could not find the Bar Complaint to validly do so since it would be to reward explicit contravention of law that is itself designed to help litigants such as the Debtor. Grounds for removal cannot rest on a conflict the Debtor herself created.

### C. The Debtor's Allegations of Specific Bias

The Debtor alleges that the Trustee and the Bankruptcy Administrator have displayed specific bias against the Tribe and herself in regard to their tribal sovereignty. She alleges this is displayed by three facts: (1) the Bankruptcy Administrator's statement that "[a]ll of [the Debtor's] pleadings [being] filed, 'all rights reserved' [below the signature], [is] another thing that's highly unusual" about the Debtor's case; (2) the Bankruptcy Administrator's statement that she could "file a motion pursuant to Rule 2004 to subpoena the materials that" the Discovery Request seeks, and that she had "some ideas from researching online who we should target;" and (3) the Trustee's and the Bankruptcy Administrator's utilization of sovereign citizen movement cases in explaining to the Court why the Debtor's tribal sovereignty was not afforded the protections she claimed.

> 1. The Debtor's Allegations of Specific Bias Based on Specific Comments Made by the Bankruptcy Administrator

As to the first fact, the Bankruptcy Administrator's use of "unusual" is descriptive, not evaluative. "Unusual" means "noticeably different from what is generally found or experienced,"

15

Unusual, Merriam-Webster Online Thesaurus, https://www.merriam-webster.com/thesaurus/unusual, and it can mark objective rarity or scarcity without implying abnormality or criticism. Here, the Bankruptcy Administrator's observation did just that. It is an objective fact that, because court filings are public records and not copyrighted, a litigant stamping every pleading "all rights reserved" is uncommon. Moreover, as discussed above, there are multiple aspects of this case that are atypical for Chapter 7, and for bankruptcy practice generally. And, indeed, "[t]ruth is an absolute defense to" such claims. *Seertech* at 18. The Bankruptcy Administrator's phrasing was matter-of-fact and about reality; it did not display any subjective view of the Debtor.

As to the second fact, "target" has two definitions: "to make a target of" or "to direct or aim." Target, Collins English Dictionary (HarperCollins Publ'rs, online ed.), https://www.collinsdictionary.com/us/dictionary/english/target. Only the former carries a negative, hostile connotation; the latter is neutral and describes, in this context, focusing an inquiry or directing lawful process. Here, as evinced by the fact that the context was regarding where to send mail, the Bankruptcy Administrator clearly used "target" in that neutral sense, identifying the proper recipients for the Discovery Request, rather than suggesting animus toward the Debtor or the Tribe.

> 2. The Debtor's Allegations of Specific Bias Based on Analogies Between Tribal Sovereignty and the Sovereign Citizen Movement

As to the third fact, the Court does not believe that the Trustee's and the Bankruptcy Administrator's analogies in any way served to transpose any negative connotations of the sovereign citizen movement onto tribal sovereignty as the Debtor alleges. That is not how analogies work in case law analysis. Analogies are, definitionally, not identity statements. *Cf., e.g.*, *Ohio Oil Co. v. Indiana*, 177 U.S. 190, 209 (1900) ("But whilst there is an analogy between

16

animals ferae naturae and the moving deposits of oil and natural gas, there is not identity between them."). Analogies do not equate, they illustrate; they are a bridge, not a mirror.

The Trustee and the Bankruptcy Administrator were not contending that the Debtor is a sovereign citizen. Rather, they offered examples to assist the Court in evaluating a narrow, dispositive point of law: claims of extranational sovereignty cannot defeat the application of generally applicable laws unless the sovereignty asserted is one that U.S. law recognizes. The Trustee's and the Bankruptcy Administrator's analogies between the sovereign citizen movement and tribal sovereignty rested solely on that limited similarity: each asserts a form of sovereignty said to lie outside ordinary civil authority. From that shared premise, the Trustee and the Bankruptcy Administrator drew the limited inference that such claims are legally ineffective absent recognition by the United States and federal law.

Everyone in this case, including the Court, understands there is a mountain of difference between tribal sovereignty and the sovereign citizen movement. Tribal sovereignty is a long-standing doctrine grounded in the unique, pre-constitutional status of Indian tribes and the federal government's trust relationship; the sovereign citizen movement is a fringe, alegal posture. But all those differences do not alter the discrete proposition for which the analogy was offered: where a litigant invokes an extranational sovereign authority to avoid generally applicable law, federal recognition is the gating requirement. Here, the Debtor's assertion of tribal sovereignty rests on a Tribe that is not recognized; accordingly, whatever its other characteristics, it does not carry the legal consequences of recognized tribal sovereignty, such as immunity or jurisdictional displacement.

Two things can be vastly different and yet share a single relevant feature; an analogy that isolates and uses that feature does not import the rest. That is what happened here. The Trustee

17

and the Bankruptcy Administrator did not equate tribal sovereignty with the sovereign citizen movement; they borrowed only the narrow point that unrecognized claims of sovereignty, whether styled as "tribal" or otherwise, cannot bar the operation of ordinary law. It is standard fare in legal reasoning to employ analogies across disparate doctrines to test a rule's predicates and consequences. The Trustee's and the Bankruptcy Administrator's use of analogy stayed well within that tradition by illuminating the recognition prerequisite without denigrating tribal sovereignty or collapsing it into the sovereign citizen movement.

In sum, the Court and the parties have been explicit that they respect the Debtor's asserted cultural identity and the importance of tribal self-determination where the law recognizes it. That respect does not alter the legal conclusion here: because the Debtor's claimed sovereignty depends on a Tribe that is not recognized, it does not supply a defense to the laws at issue. The Court therefore rejects any suggestion that the Trustee's and the Bankruptcy Administrator's analogies were pejorative; they were properly confined to the recognition question and were credited only for that limited purpose.

**********

Simply, all the Debtor's accusations alleging cause for recusal are actions that are legally required of the Trustee or the Bankruptcy Administrator. This cannot validly form the basis for recusal.

### CONCLUSION

The Court hopes that the above analysis clearly elucidates why the allegations against the Trustee and the Bankruptcy Administrator do not suffice for recusal grounds since there is no cause. Furthermore, though, the Court, conscious of its own duty of neutrality, but also aware that the Debtor has forced its hand to weigh in on the performance of the Trustee and the Bankruptcy Administrator, feels it necessary to state the following: the Trustee's and the Bankruptcy

Administrator's conduct in this case has been faultless. Despite the complexity of this case, the Trustee and the Bankruptcy Administrator have continually performed their statutory duties such as locating the litany of originally undisclosed bank accounts to which the Debtor transferred money. They have waded through the thousands of pages of documents the Debtor has provided to pinpoint information important to the case. They have both dedicated the time necessary to this case, sometimes on the weekend, despite having a multitude of other cases. They have also conducted themselves in court, despite any understandable frustration the Debtor had engendered, with grace. Contrarily, the Debtor's conduct in this case has been unsatisfactory pursuant to her duties under the Bankruptcy Code and general legal provisions, not to mention the Contempt Orders from this Court.

**WHEREFORE IT IS ORDERED** that Debtor's Motion for recusal is DENIED.

**SO ORDERED**.

| | |
|---|---|
| This Order has been signed electronically. The Judge's signature and Court's seal appear at the top of the Order. | United States Bankruptcy Court |